1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10   JIMMY CHI COOC,

11               Petitioner,                No. CIV S-10-0882 GEB EFB P

12         vs.

13   ANTHONY HEDGPETH, Warden,

14               Respondent.              FINDINGS AND RECOMMENDATIONS

15   _____/

16         Petitioner is a state prisoner proceeding through counsel with an application for a writ of

17   habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges a 2006 judgment of

18   conviction entered against him in the Sacramento County Superior Court on a charge of first

19   degree murder with use of a firearm.  He seeks relief on the grounds that: (1) jury instruction

20   error violated his right to due process; (2) the trial court's response to a jury question violated his

21   right to due process; (3) the trial court's exclusion of evidence violated his right to due process,

22   to present a defense, and to trial by jury; and (4) the trial court's charge to the jury during

23   deliberations coerced the jury to reach a unanimous verdict against him, in violation of his rights

24   to due process, an impartial jury, and a fair trial.  Upon careful consideration of the record and

25   the applicable law, the undersigned recommends that petitioner's application for habeas corpus

26   relief be denied.

                                                1

**I.    Factual Background[1]**

On a December night just before Christmas, Matthew Seivert was lured to Tahoe Park in Sacramento by his ex-girlfriend, Nicole Carroll.  As the couple talked on a park bench, a group of 12 youths in three separate cars waited stealthily to attack him.  When Seivert got into his car and attempted to leave, the youths blocked his exit and one of them shot him to death.

Carroll and four members of the group were charged with murder. Six other youths, who were granted immunity, testified at the trial, during which the jury heard evidence of a conspiracy to "jump" Seivert because he had made racial slurs about Asians.  The jury found all five defendants guilty of first degree murder (Pen.Code, § 187, subd. (a))[2] and found true the special circumstance that the shooter, defendant Hung Thieu Ly, committed the murder while lying in wait (§ 190.2, subd. (a)(15)) (hereafter section 190.2(a)(15)).

Ly and his four convicted accomplices – Nicole Carroll, Jimmy Chi Cooc, John Dich and Chan Venh ("John") Lam – appeal. Their arguments include erroneous jury instructions, error in admission and exclusion of evidence, prosecutorial misconduct, and the sufficiency of the evidence to support the verdict.  We find no prejudicial error.  With the exception of a minor sentencing correction as to defendant Ly, we shall affirm all five judgments.

**FACTUAL BACKGROUND**

**The shooting**

On December 23, 2003, 19-year-old Matthew Seivert was living with his mother, Stepheny Milo, at her home in East Sacramento. Seivert and Carroll had been high school sweethearts, but they broke up when Carroll moved to Los Angeles in 2001.  Around 8:00 p.m., Carroll called for Seivert, but he was not home.  Seivert received a second call shortly before midnight, after which he asked his mother if he could borrow her Toyota Camry so he could "see Nicole."  Although Milo initially refused, she finally relented and let her son borrow the car.

Around 1:45 a.m., Sacramento City Police Officer Barry Lee went to Tahoe Park in response to a report of shots fired.  Lee drove around the park, but saw nothing.  At 2:20 a.m., Lee returned to a

---

[1]  In its unpublished memorandum and opinion affirming petitioner's judgment of conviction on appeal, the California Court of Appeal for the Third Appellate District provided the following factual summary.

[2]  Undesignated statutory references are to the Penal Code.

2

location on Eighth Avenue, very close to the park, and discovered the Camry, which had crashed up against a chain link fence. Seivert, unconscious and incoherent, was transported by ambulance from the Camry to the hospital.

Seivert suffered two gunshot wounds, one to the left side of the head and another to the right chest. He also suffered lacerations and abrasions, consistent with having been struck by flying glass. Seivert died from his wounds.

Three bullet jackets from a .38-caliber Charter Arms revolver were recovered from the Camry. There was possible bullet damage to the front driver's-side window, the rear driver's-side window and the rear window. A detective who inspected the Camry opined that gunshots had pierced each of the three windows.

**The plot**

Six immunized witnesses – Quoc Lam,[3] Sieu Nguyen, Johnson Phan, Dac Su, Davis To and Damon Voong – testified about a meeting that took place at Voong's house on the evening of December 23, during which the plan was hatched to attack Seivert at Tahoe Park. Sometimes their versions coincided; often their testimony conflicted not only with each other, but with the same witness's prior statements. In accordance with settled principles (*People v. Sotomayor* (1996) 47 Cal.App.4th 382, 386, 54 Cal.Rptr.2d 871; *Jackson v. Virginia* (1979) 443 U.S. 307, 319 [61 L.Ed.2d 560, 573-574] ), we recite the evidence in the light most favorable to the judgments.

John Lam, who was then dating Nicole Carroll, was angry with Seivert for making disparaging remarks about Asians in phone calls to Carroll, saying things like "fuck Asians" and referring to them as "Chinks." Lam devised a plan whereby Carroll would phone Seivert and ask him to meet her at Tahoe Park; Lam and his friends would drive to the park, wait for Seivert and then "jump" him or beat him up.

Lam called his cousin Quoc and told him about the plan to lure Seivert to the park and jump him. Quoc went to his house and got his nunchakus. He also had golf clubs in his trunk, which he thought could be used. Lam called his cousin Davis To and told him he wanted to "kick this white kid's ass" for making racial slurs. Lam's friends and relatives contacted others, until 11 young men arrived at Voong's house, where they met with Carroll and Lam. At the meeting were the five defendants – Carroll, Cooc, Dich, Lam and Ly – as well as the witnesses who testified under a

---

[3] To avoid confusion with defendant John Lam, we hereinafter refer to John Lam as "Lam" and his cousin, Quoc Lam, as "Quoc."

grant of immunity.

At Voong's house, Lam brought up the subject of beating up the "white boy" to "teach him a lesson" about using racial slurs. Carroll said she wanted Seivert beaten up because she did not like him.  Lam explained that Seivert would meet Carroll at Tahoe Park, that the group should wait for him to get out of his car and then jump him.  Quoc intended to approach Seivert from behind, hit him a couple of times and smash his car with the nunchakus. Su intended to jump out of Quoc's car and beat Seivert up.  There was some discussion at the house about Cooc and Ly having guns. However, killing or shooting Seivert was not explicitly discussed.

During the meeting at Voong's house, Carroll called Seivert. Later, after speaking on her cell phone, she told the group that Seivert had called and they should go to Tahoe Park.  Lam told everyone "let's go" and instructed them to leave for the park.  He told Quoc to meet him on the other side of the park and to block the Camry.

The group traveled to Tahoe Park in three separate vehicles.  The table below[4] shows the vehicles that were driven and their respective drivers and occupants.

Acura RSX

**John Lam** (driver )*
**Nicole Carroll**\*

Honda Pilot

**John Dich** (driver )*
**Jimmy Chi Cooc**\*
**Hung Thieu Ly**\*
Johnson Phan
Sieu Nguyen
Damon Voong
Tommy Vu

Honda Accord

Quoc Lam (driver )
Dac Su
Davis To
Johnny Truong

*Defendants' names appear in boldface type.

---

[4]  The table is derived from Ly's opening brief.  No one disputes its accuracy.

As they drove to the park, Cooc and Dich had a conversation about a gun. Dich wanted to see Cooc's nine-millimeter gun, and it was passed around the Honda Pilot. Ly's .38-caliber revolver was also passed around. Ly tied a blue or black rag around his face that covered his nose and mouth.

The three cars split up when they got to the park. They waited about 15 minutes for Seivert to arrive. Carroll alerted them by phone that Seivert was on his way.

Seivert arrived at the park, got out of his Camry and approached Carroll, who was seated on a bench. The couple talked for a few minutes. Seivert reached for Carroll, but she pulled away. Seivert then returned to the Camry. Lam and Dich each said, "Let's go get him," or words to that effect. Because Seivert had backed into the parking space, someone in the Pilot said, "Block him out." Dich then drove the Pilot toward the driver's side of the Camry, parking at an angle. The Camry moved forward a little, but Lam's Acura RSX also pulled in front of the Camry, causing it to stop. The Camry was blocked in and had no room to leave. Quoc retrieved the nunchakus and Dac Su took out a golf club.

Ly got out of the Pilot and pulled a gun from his waistband. Cooc also got out of the car with his gun drawn. Vu threw a Heineken bottle, which hit the Camry. Ly stood in front of the Camry and pointed his gun at the front windshield saying, "Don't move" or "stop, stop, stop." Some witnesses thought Seivert revved the engine and the Camry may have moved forward a little.

Ly fired at least three shots at the Camry. The first shot was fired at the front windshield, the second shot from the driver's side door, and the third from behind the Camry by the trunk. The group then returned to their vehicles and drove back to Voong's house. On the way back, Ly exclaimed, "I got him in the head," or "I got him, I got him. He almost ran me over." Ly also said, "I did what I had to do," and "if he hadn't of moved I wouldn't have shot him. He almost ran me over."

Back at the house, Carroll smiled and said something to the effect of "Oh, well, I didn't like him anyways." About a week later, Lam called To and said he had spoken with a homicide detective and that he (To) should keep his story straight.

On January 10, 2004 (all further calendar references are to that year), about three weeks after the shooting, police recovered a loaded nine-millimeter semiautomatic firearm from Cooc's residence. Two days later, police recovered the .38-caliber revolver used to kill Seivert from Dich's residence.

Police recovered a box of .38-caliber live ammunition from Ly's home. The cartridges were loaded with soft-point, brass-jacketed

5

Winchester .38 Special bullets – similar in all respects to the bullets fired into the Camry.  They also found two bandanas, one dark navy blue and the other black.

Mobile phone records showed that defendants and the other participants placed numerous calls on their cell phones to one another throughout the late night and early morning hours of December 23 and 24, 2003.  Carroll's cell phone records showed that she called Seivert's residence at 7:22 p.m. and 11:47 p.m.  In addition, she called Seivert's cell phone at 12:39 a.m., 12:47 a.m. and 12:55 a.m. (minutes before the shooting), each time using "*67," which is a means of blocking the calling number from display on the receiver's phone.

**Defense case**

None of defendants testified.  Defense counsel focused their defense on four central themes: (1) the prosecution witnesses who testified about the plot and shooting were unreliable and self-contradictory; (2) no one who participated in the plot to "jump" Seivert said anything about shooting him; (3) Ly's decision to shoot Seivert was the unanticipated act of a maverick, and thus the crime of murder was not the natural and probable consequence of the agreement to beat up the victim; and (4) under the doctrine of imperfect self-defense, Ly's shooting of Seivert was not murder because Ly harbored a good faith but unreasonable belief that Seivert was trying to run him over with the Camry.

The jury found Ly guilty of first degree murder with personal use of a firearm (§ 12022.53, subd. (d)); the jury also found true as a special circumstance that he intentionally killed the victim by lying in wait.  Defendants Carroll, Cooc, Dich and Lam were found guilty of first degree murder, with a special finding that they were armed within the meaning of section 12022, subdivision (a)(1).

Dckt. 1-1 at 2-10.

## II.   Procedural Background

Petitioner's judgment of conviction was affirmed in its entirety by the California Court of Appeal for the Third Appellate District.  *Id.*[5]  Petitioner subsequently filed a petition for review in the California Supreme Court, which was summarily denied.  Dckt. 1-3.  Petitioner filed his federal habeas petition in this court on April 13, 2010.

---

[5]  The Court of Appeal later modified its opinion without changing the judgment.  Dckt. No. 1-2.

III.    **Analysis**

    **A.  Standards for a Writ of Habeas Corpus**

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation or application of state law.  *See Wilson v. Corcoran*, 562 U.S.___, ___, 131 S. Ct. 13, 16 (2010); *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Park v. California*, 202 F.3d 1146, 1149 (9th Cir. 2000).

Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For purposes of applying § 2254(d)(1), "clearly established federal law" consists of holdings of the United States Supreme Court at the time of the state court decision.  *Stanley v. Cullen*, 633 F.3d 852, 859 (9th Cir. 2011) (*citing Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)).  Nonetheless, "circuit court precedent may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably."  *Stanley*, 633 F.3d at 859 (quoting *Maxwell v. Roe*, 606 F.3d 561, 567 (9th Cir. 2010))

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts.  *Price v. Vincent*, 538 U.S. 634, 640 (2003).

1    Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant

2    the writ if the state court identifies the correct governing legal principle from the Supreme

3    Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.[6]

4    *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *Williams*, 529 U.S. at 413; *Chia v. Cambra*, 360

5    F.3d 997, 1002 (9th Cir. 2004).  In this regard, a federal habeas court "may not issue the writ

6    simply because that court concludes in its independent judgment that the relevant state-court

7    decision applied clearly established federal law erroneously or incorrectly.  Rather, that

8    application must also be unreasonable." *Williams*, 529 U.S. at 412.  *See also Schriro v.*

9    *Landrigan*, 550 U.S. 465, 473 (2007); *Lockyer*, 538 U.S. at 75 (it is "not enough that a federal

10   habeas court, in its independent review of the legal question, is left with a 'firm conviction' that

11   the state court was 'erroneous.'").  "A state court's determination that a claim lacks merit

12   precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness

13   of the state court's decision." *Harrington v. Richter*, 562 U.S.___,___,131 S. Ct. 770, 786

14   (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  Accordingly, "[a]s a

15   condition for obtaining habeas corpus from a federal court, a state prisoner must show that the

16   state court's ruling on the claim being presented in federal court was so lacking in justification

17   that there was an error well understood and comprehended in existing law beyond any possibility

18   for fairminded disagreement." *Harrington*,131 S. Ct. at 786-87.

19        If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing

20   court must conduct a de novo review of a habeas petitioner's claims. *Delgadillo v. Woodford*,

21   527 F.3d 919, 925 (9th Cir. 2008); *see also Frantz v. Hazey*, 533 F.3d 724, 735 (9th Cir. 2008)

22   (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of

23   ////

---

25   [6] Under § 2254(d)(2), a state court decision based on a factual determination is not to be
     overturned on factual grounds unless it is "objectively unreasonable in light of the evidence
     presented in the state court proceeding." *Stanley v. Cullen*, 633 F.3d 852, 859 (9th Cir. 2011)
26   (quoting *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004)).

1  § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by

2  considering de novo the constitutional issues raised.").

3          The court looks to the last reasoned state court decision as the basis for the state court

4  judgment.  *Stanley*, 633 F.3d at 859; *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004).

5  If the last reasoned state court decision adopts or substantially incorporates the reasoning from a

6  previous state court decision, this court may consider both decisions to ascertain the reasoning of

7  the last decision.  *Edwards v. Lamarque*, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc).  "When

8  a federal claim has been presented to a state court and the state court has denied relief, it may be

9  presumed that the state court adjudicated the claim on the merits in the absence of any indication

10 or state-law procedural principles to the contrary."  *Harrington*, 131 S. Ct. at 784-85.  This

11 presumption may be overcome by a showing "there is reason to think some other explanation for

12 the state court's decision is more likely."  Id. at 785 (citing *Ylst v. Nunnemaker*, 501 U.S. 797,

13 803 (1991)).  Where the state court reaches a decision on the merits but provides no reasoning to

14 support its conclusion, a federal habeas court independently reviews the record to determine

15 whether habeas corpus relief is available under § 2254(d).  *Stanley*, 633 F.3d at 860; *Himes v.*

16 *Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).   "Independent review of the record is not de novo

17 review of the constitutional issue, but rather, the only method by which we can determine

18 whether a silent state court decision is objectively unreasonable."  *Himes*, 336 F.3d at 853.

19 Where no reasoned decision is available, the habeas petitioner still has the burden of "showing

20 there was no reasonable basis for the state court to deny relief."  *Harrington*, 131 S. Ct. at 784.

21         When it is clear, however, that a state court has not reached the merits of a petitioner's

22 claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal

23 habeas court must review the claim de novo.  *Stanley*, 633 F.3d at 860; *Reynoso v. Giurbino*, 462

24 F.3d 1099, 1109 (9th Cir. 2006); *Nulph v. Cook,* 333 F.3d 1052, 1056 (9th Cir. 2003).

25 ////

26 ////

1     **B. Petitioner's Claims**

2     **1. Erroneous Jury Instruction on Felony Murder**

3         Petitioner's first claim is that the trial court violated his rights to due process and a fair

4     trial when it gave an erroneous jury instruction on a "non-existent crime" that permitted the jury

5     to convict him of murder without making essential findings regarding his state of mind.  Dckt.

6     No. 1 at 47.  The California Court of Appeal explained the legal and factual background to this

7     claim, and its ruling thereon, as follows:

8             **I. CALJIC No. 8.51- *Ireland*[7] Error**

9             During an in-chambers discussion, Carroll's attorney asked that
              the jury be instructed on second degree felony murder.  (CALJIC
10            No. 8.32.)  The prosecutor was opposed, pointing out that there
              would be no predicate crime to which such an instruction could
11            attach, and the trial court agreed.  In conformance with this ruling,
              the court deleted all references to felony murder in CALJIC Nos.
12            8.10 and 8.50.  The clerk's transcript reflects that the court refused
              defense requests for CALJIC Nos. 8.32 (second degree felony
13            murder) and 8.34 (second degree felony murder-aider and abettor
              liability).  Nevertheless, at the request of defendants Carroll, Cooc
14            and Ly, the trial court did give CALJIC No. 8.51.  As read to the
              jury, the instruction stated:
15
              "*If a person causes another's death, while committing a felony*
16            *which is dangerous to human life, the crime is murder*.  If a person
              causes another's death, while committing a misdemeanor which is
17            dangerous to human life under the circumstances of its
              commission, the crime is involuntary manslaughter.  [¶]  There are
18            many acts which are lawful but nevertheless endanger human life.
              If a person causes another's death by doing an act or engaging in
19            conduct in a criminally negligent manner, without realizing the
              risk involved, he is guilty of involuntary manslaughter. [¶]  If, on
20            the other hand, the person realized the risk and acted in total
              disregard of the danger to life involved, malice is implied, and the
21            crime is murder."  (CALJIC No. 8.51, italics added.)

22            Although the jury was never told which crime could qualify as a
              "dangerous-to-human-life" felony within the meaning of the above
23            instruction, they were given CALJIC No. 9.02, which sets out the
              elements of assault by means likely to produce great bodily injury
24            (hereafter also felonious assault).

25

26        [7]  *People v. Ireland* (1969) 70 Cal.2d 522, 75 Cal.Rptr. 188, 450 P.2d 580 (*Ireland*).

                                        10

All five defendants now claim that the giving of a felony-murder charge to the jury constituted prejudicial error because, under the "merger" doctrine, felonious assault may not be used as a predicate felony for applying the felony-murder rule.  (*Ireland, supra*, 70 Cal.2d at p. 538, 75 Cal.Rptr. 188, 450 P.2d 580.)

We initially conclude that Carroll, Cooc and Ly are estopped from raising this claim.  CALJIC No. 8.51 was explicitly requested by all three defendants.  When defense counsel makes a deliberate, tactical choice to request a particular instruction, the rule of invited error applies, and the defendant cannot challenge it on appeal.  (*People v. Wader* (1993) 5 Cal.4th 610, 657-658, 20 Cal.Rptr.2d 788, 854 P.2d 80.)  Here, defendants had a tactical purpose in requesting a felony-murder instruction.  A reflexive adoption of the felony-murder rule using the predicate crime of felonious assault would have produced a verdict of second degree murder.  (*Ireland, supra*, 70 Cal.2d at p. 538, 75 Cal.Rptr. 188, 450 P.2d 580.)  A felony-murder instruction thus gave the jurors the option of shortcutting to a verdict of second degree murder without undertaking the more probing inquiry of whether defendants should be found guilty of *first degree* murder based on premeditation and/or lying in wait.  Because there was a plausible tactical reason for requesting CALJIC No. 8.51 (i.e., avoiding a first degree murder verdict), Carroll, Cooc and Ly are precluded from challenging it on appeal.  (*People v. Hardy* (1992) 2 Cal.4th 86, 152, 5 Cal.Rptr.2d 796, 825 P.2d 781.)  However, we must still decide whether the instruction was prejudicial as to Dich and Lam.

In *Ireland, supra*, 70 Cal.2d 522, 75 Cal.Rptr. 188, 450 P.2d 580, the California Supreme Court adopted the "merger" rule in a case involving the underlying felony of assault with a deadly weapon, where the defendant had shot and killed his wife.  The jury was instructed that the defendant could be convicted of second degree murder based on the felony-murder rule "'when the killing is a direct causal result of the perpetration or attempt to perpetrate a felony inherently dangerous to human life, *such as an assault with a deadly weapon*.'"  (*Id.* at p. 538, 75 Cal.Rptr. 188, 450 P.2d 580, italics added.)

The state Supreme Court reversed, reasoning that "[t]o allow such use of the felony-murder rule would effectively preclude the jury from considering the issue of malice aforethought in all cases wherein homicide has been committed as a result of a felonious assault – a category which includes the great majority of all homicides.  This kind of bootstrapping finds support neither in logic nor in law."  (*Ireland, supra*, 70 Cal.2d at p. 539, 75 Cal.Rptr. 188, 450 P.2d 580.)  The court therefore concluded that the offense of assault with a deadly weapon, which was "an integral part of" and "included in fact " within the homicide, could not support a second degree felony-murder instruction.  (*Ibid.*)

As the People concede and the trial court recognized at the hearing on the motion for new trial, it was *Ireland* error to include the first sentence of CALJIC No. 8.51 in the instruction.  However, we also agree with the trial court that the error was harmless beyond a reasonable doubt.

When a jury is instructed on an irrelevant theory that may inject confusion into its deliberations, we ask whether "there is 'a reasonable likelihood' the jury understood the instructions as the defendant asserts."  (*People v. Cain* (1995) 10 Cal.4th 1, 36, 40 Cal.Rptr.2d 481, 892 P.2d 1224, quoting *Estelle v. McGuire* (1991) 502 U.S. 62, 72 [116 L.Ed.2d 385, 399].)  In making this determination, "[i]t is well established that the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." (*Estelle v. McGuire, supra*, 502 U.S. at p. 72, 112 S.Ct. at p. ---- [116 L.Ed.2d at p. 399]; *see also People v. Mincey* (1992) 2 Cal.4th 408, 451, 6 Cal.Rptr.2d 822, 827 P.2d 388.)

This case is analogous to *People v. Barnett* (1998) 17 Cal.4th 1044, 74 Cal.Rptr.2d 121, 954 P.2d 384.  There, the trial court instructed, in pertinent part: "'The crime of murder is the unlawful killing of a human being with malice aforethought *or unlawful killing of a human being which occurs during the commission or attempted commission of a felony inherently dangerous to human life*.  [¶]  In order to prove the commission of the crime of murder, each of the following elements must be proved. . . .  [T]he killing was done with malice aforethought.'"  (*Id.* at p. 1154, 74 Cal.Rptr.2d 121, 954 P.2d 384.)  Barnett argued that this instruction was prejudicial because it allowed the jury to convict him of murder based on the commission of felonies that were impermissible under the merger doctrine, such as assault or assault with a deadly weapon.  (*Ibid.*)  The California Supreme Court found no reversible error because the other instructions given clearly informed the jurors that there could be no conviction of first degree murder unless they found deliberation and premeditation.  (*Ibid.*)  Moreover, the record was clear that the prosecutor was arguing for conviction on the theory of deliberate and premeditated murder, not felony murder.  (*Id.* at pp. 1154-1155, 74 Cal.Rptr.2d 121, 954 P.2d 384.)  Accordingly, the court concluded, "no reasonable juror could possibly have understood that guilt could be predicated upon a felony-murder theory."  (*Id.* at p. 1155, 74 Cal.Rptr.2d 121, 954 P.2d 384.)

A similar result is mandated here.  Unlike *Ireland* or the situation in defendants' favorite case, *Suniga v. Bunnell* (1993) 998 F.2d 664, 666, there was no instruction telling the jury *which felony* could qualify for felony-murder liability.  The verdict form did not ask the jury to identify a felony underlying a finding of murder and the trial court expressly refused to give any other instructions on the felony-murder rule.  Under these circumstances, giving the first

sentence of CALJIC No. 8.51 was akin to giving the jury a rod and a line, but no hook, lure or bait, and expecting it would catch a fish.  The first sentence of CALJIC No. 8.51 was nothing but an orphaned charge that found no support in the other instructions with which the jury had to grapple.

Defendants hypothesize that the instruction was prejudicial because it could have induced the jury to assume the existence of malice without making the necessary findings on the elements thereof.  However, nothing in CALJIC No. 8.51 told the jury it did not have to find malice before finding defendants guilty of murder.  On the contrary, the instructions clearly required the jury to find malice in order to convict defendants of murder.[8]  The jury was also instructed that the malice element would be negated if the killing was done in the heat of passion or under an unreasonable belief in the need for self-defense.  These instructions are inherently inconsistent with the concept that a killing by means of felonious assault is automatically murder; and it would be unreasonable to conclude that the jury simply tossed them aside in favor of an incomplete felony-murder charge that did not identify a predicate felony for its application.  (*See People v. Coddington* (2000) 23 Cal.4th 529, 594, 97 Cal.Rptr.2d 528, 2 P.3d 1081 [courts presume that jurors approach the instructions with intelligence and common sense], *overruled on other grounds* in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13, 108 Cal.Rptr.2d 409, 25 P.3d 618.)  We find it unlikely the jury viewed the first sentence of CALJIC No. 8.51 as anything other than an irrelevant instruction that had no applicability to the case.

Lastly, neither the prosecutor nor defense counsel suggested to the jury that it could return a murder verdict based on the fact Seivert was killed during the commission of a felonious assault. Instead, the prosecutor urged the jury to return a verdict of first degree murder by lying in wait which, according to the instructions, required findings of (1) intent to inflict bodily harm involving a high degree of probability that it will result in death; (2) wanton disregard for human life; and (3) "a state of mind equivalent to premeditation or deliberation."  The jury's verdict of first degree murder against accomplices Carroll, Cooc, Dich and Lam, coupled with its special-circumstance finding that Ly murdered by lying in wait, renders it virtually certain that the jury did not arrive at a murder verdict by using the felony-murder rule.

---

[8]  Using the language of CALJIC No. 8.10, the trial court told the jury: "Defendants are accused of having committed the crime of murder. . . .  [¶] . . .  In order to prove this crime *each of the following elements must be proved*: [¶] . . .  [¶][T]he killing was done with malice aforethought."  (Italics added.)  Using the language of CALJIC No. 8.11, the court then set out the legal requirements for a finding of malice.

1          We conclude beyond a reasonable doubt that any *Ireland* error was
2          harmless.

3    Dckt. No. 1-1 at 10-16.

4          Petitioner challenges the conclusion of the California Court of Appeal that the trial

5    court's instructional error was harmless.  He argues that the fact the trial court did not give jury

6    instructions defining the underlying felony for the felony-murder rule, or describing the felony-

7    murder rule in more detail, is immaterial because the jury would not have known to expect such

8    instructions.  Dckt. No. 1 at 49-50.  He contends the jury would have assumed that the

9    underlying felonies were either assault, or assault with intent to cause great bodily injury,

10   because the jury was instructed on those felonies.  *Id.* at 50.  Petitioner further argues that the

11   jury would have followed the felony-murder instruction because it was "readily comprehensible"

12   and juries "are presumed to follow the instructions they are given."  *Id.*  Petitioner argues that

13   other jury instructions that informed the jury they must find malice in order to convict any of the

14   defendants of murder cannot be permitted to remedy the flaws in the incorrect instruction.  *Id.* at

15   51.  He explains, "there was nothing about the trial court's other instructions that negated or

16   rendered inoperative the erroneous instruction permitting the jury to convict on a theory of

17   culpability that did not exist."  *Id.* at 52.

18         Petitioner further contends that the jurors would have followed the erroneous jury

19   instruction and not the prosecutor's closing argument, because they were instructed that "if

20   anything concerning the law said by the attorneys in their arguments or at any other time during

21   the trial conflicts with my instructions on the law, you must follow my instructions."  *Id.* at 52-

22   53.  Petitioner also argues that the verdict is not a reliable indicator that the jury did not rely on a

23   felony-murder theory to reach a murder verdict.  *Id.* at 53-54.  He contends that his first-degree

24   murder conviction "could just as easily have been the product of the jury's unconstitutionally

25   finding murder without malice through application of the erroneous instruction, and elevating it

26   to first degree for all defendants, including petitioner, through lying in wait."  *Id.* at 54.  Finally,

1  petitioner reviews the evidence introduced at his trial and argues that, without the erroneous

2  felony-murder jury instruction, the evidence did not support his conviction of first degree murder

3  under the natural and probable consequences doctrine.  *Id.* at 56-58.  Petitioner summarizes his

4  arguments as follows:

> 5  In sum, a reasonable jury would have applied the erroneous
> instruction, which provided an entirely independent route to
> 6  convict apart from malice murder.  Petitioner's murder conviction
> was likely based on the jury's erroneous view of the law.  The jury
> 7  could have believed that Ly had not acted with malice *and* that the
> homicide was not a natural-and-probable consequence of the
> 8  assault that petitioner had aided and abetted and *still* convicted him
> of murder.

9

10  *Id.* at 57-58.

11          Respondent argues that the California Court of Appeal's conclusion that petitioner is

12  estopped from raising this claim constitutes a procedural default which prevents this court from

13  considering the merits of the claim.  Answer, at 13.  The United States Supreme Court has held

14  that, when a state law default prevents the state court from reaching the merits of a federal claim,

15  considerations of comity and concerns for the orderly administration of justice require a federal

16  court to forego the exercise of its habeas corpus power unless the habeas petitioner can

17  demonstrate both cause for failing to meet the state procedural requirement and actual prejudice.

18  *See Wainwright v. Sikes*, 433 U.S. 72, 87 (1977); *Francis v. Henderson*, 425 U.S. 536, 539-42

19  (1976); *Ylst v. Nunnemaker*, 501 U.S. 797, 800-01 (1991).  However, a reviewing court need not

20  invariably resolve the question of procedural default prior to ruling on the merits of a claim.

21  *Lambrix v. Singletary*, 520 U.S. 518, 524-25 (1997); *Franklin v. Johnson*, 290 F.3d 1223, 1232

22  (9th Cir. 2002) ("Procedural bar issues are not infrequently more complex than the merits issues

23  presented by the appeal, so it may well make sense in some instances to proceed to the merits if

24  the result will be the same.").  Under the circumstances presented here, this court finds that

25  petitioner's jury instruction claim can be readily resolved by addressing it on the merits and will

26  therefore assume that the claim is not subject to a procedural default.

In *Fry v. Pliler*, 551 U.S. 112, 121-22 (2007), the United States Supreme Court clarified that the AEDPA did not replace the traditional test for prejudice on collateral review established in *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).[9]  After *Fry*, a federal habeas court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in *Brecht* 507 U.S. 619.  Further, [w]hen a state court has found a constitutional error to be harmless beyond a reasonable doubt, a federal court may not grant habeas relief unless the state court's determination is objectively unreasonable." *Towery v. Schriro*  641 F.3d 300, 307 (9th Cir. 2010).[10]

As set forth above, the California Court of Appeal concluded that the instructional error in this case was harmless "beyond a reasonable doubt" because: (1) the erroneous jury instruction was an incomplete statement of the felony-murder rule, and was inconsistent with other jury instructions with regard to the requirement to find malice before reaching a guilty verdict on a murder charge, and was therefore unlikely to have been relied on by the jury in this case; (2) numerous other jury instructions informed the jury that it had to find malice in order to convict petitioner and the other defendants of murder; (3) other jury instructions, including one which informed the jury that the malice element could be negated by other factors in this case, were inconsistent with a theory that the jury did not have to find malice in order to convict the defendants of murder; (4) it was unreasonable to conclude that the jury ignored the bulk of the jury instructions and instead found the defendants guilty of murder without a finding of malice,

---

[9]  *Brecht* held that on collateral review of a state court criminal judgment under 28 U.S.C. § 2254, an error is harmless unless it had "a substantial and injurious effect or influence in determining the jury's verdict."  507 U.S. at 631.

[10]  The court notes that the instructional error at issue here is not a structural error which requires automatic reversal, but is a trial error subject to harmless error analysis.  *See Hedgpeth v. Pulido*, 555 U.S. 57 (2008) (instructing a jury on multiple theories of guilt, one of which is invalid, is subject to *Brecht* harmless error analysis); *Neder v. United States*, 527 U.S. 1 (1999) (erroneous jury instruction that omits element of offense is subject to harmless-error analysis); *Byrd v. Lewis*, 566 F.3d 855, 863-64 (9th Cir. 2009) (harmless error review applies to an instructional error that affects an element of the offense, a permissible evidentiary inference, or a potential theory of conviction).

1  based on one incomplete instruction that did not tell the jury they could dispense with the malice

2  requirement; (5) the prosecutor specifically relied on a theory of first degree murder by lying in

3  wait, which required malice; and (6) the jury found defendants guilty of first degree murder by

4  lying in wait, which reflected that they did not rely on a felony murder theory to convict.  This

5  court agrees with the state appellate court that, under these circumstances, the trial court's

6  instructional error was harmless.  Viewing the trial record as a whole, including the entirety of

7  the jury instructions, and for the reasons expressed by the California Court of Appeal, the

8  erroneous language contained in CALJIC No. 8.51 could not have had a substantial or injurious

9  effect on the verdict in this case.  Certainly the decision of the California Court of Appeal is not

10  "so lacking in justification that there was an error well understood and comprehended in existing

11  law beyond any possibility for fairminded disagreement."  *Harrington*,131 S. Ct. at 786-87.

12      The court rejects petitioner's argument that CALJIC No. 8.51, as given, caused the jury

13  to disregard all of the other, correct instructions on the need to find malice in order to return a

14  first degree murder verdict.  There is no evidence that this is the case, and "a single instruction to

15  a jury may not be judged in artificial isolation, but must be viewed in the context of the overall

16  charge" *Cupp v. Naughten*, 414 U.S. 141, 146-47 (1973).  The court also notes that none of the

17  defendants in this case objected to the giving of CALJIC No. 8.51.  "It is the rare case in which

18  an improper instruction will justify reversal of a criminal conviction when no objection has been

19  made in the trial court."  *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977).

20      Petitioner's reliance on *Suniga v. Bunnell* in support of this claim is misplaced.  In

21  *Suniga*, a case decided prior to the enactment of AEDPA, the court gave both a proper murder

22  instruction and an improper felony-murder instruction.  However, unlike here, the jury was

23  specifically instructed that assault with a deadly weapon was a felony that is inherently

24  dangerous to human life.  998 F.2d at 667.  Further, in *Suniga*, it was not possible to determine

25  with certainty whether the jury relied on the unconstitutional theory to reach its guilty verdict.

26  *Id.* at 668, 669.  The Ninth Circuit recognized that the erroneous felony-murder instruction

17

1 permitted the jury to convict the defendant on the basis of a nonexistent legal theory. *Id.* In that

2 court's view, under these circumstances the erroneous instruction "infected the entire trial,"

3 violated due process, and required that the defendant's conviction be set aside without a showing

4 of harmless error. *Id.* Although the California Court of Appeal had found the instructional error

5 to be harmless, the Ninth Circuit was not required to defer to this determination because it was

6 not constrained by AEDPA.

7       Here, unlike in *Suniga*, the predicate offense for felony murder was not identified for the

8 jury, and the verdict indicated that the jury did not rely on a theory of felony-murder to find the

9 defendants guilty of murder. Indeed, the California Court of Appeal opined that it was "virtually

10 certain that the jury did not arrive at a murder verdict by using the felony-murder rule." Dckt.

11 No. 1-1 at 16. *Suniga* is therefore factually distinguishable and does not dictate the result here.

12 *See Townsend v. Knowles*, 562 F.3d 1200, 1210 (9th Cir.), *cert. denied*, ___ U.S. ___, 130 S.Ct.

13 193 (2009), *abrogated on other grounds* by *Walker v. Martin*, ___ U.S. ___ (2011)

14 (distinguishing *Suniga* and rejecting petitioner's claim that an erroneous felony-murder

15 instruction allowed his jury to find him guilty of murder without proof of malice aforethought, in

16 part because the jury verdict indicated that "the jury must have found that he acted with malice"

17 when they found petitioner guilty of second degree murder, which requires a finding of malice

18 aforethought); *Shackleford v. Hubbard*, 234 F.3d 1072, 1077-79 (9th Cir. 2000) (distinguishing

19 *Suniga* because, even though jury was instructed on non-existent felony murder theory, error was

20 harmless because it was certain that the jury returned a guilty verdict on the legally correct

21 theory of first-degree murder by torture); *Williams v. Carey*, No. C 05-3891 RMW(PR), 2010

22 WL 143465 at **4-5 (N.D. Cal. Jan. 5, 2010) (distinguishing *Suniga* and finding that erroneous

23 felony-murder instruction did not violate petitioner's right to due process where the jury was not

24 given any other instructions on the felony murder theory; the jury was not instructed on whether

25 any other felonies would qualify as an inherently dangerous felony; the trial court properly

26 instructed on second degree murder as well as express and implied malice; and the jury was

1   instructed to consider the instructions as a whole and in light of all the other instructions);

2   *Thomas v. Lamarque*, No. C 02-2981 VRW, 2005 WL 679745 at \*\*6-7 (N.D. Cal. March 16,

3   2005) (distinguishing *Suniga* because the jury in that case was not instructed that assault with a

4   deadly weapon is a felony and because "the [erroneous] instruction was a solitary and

5   inapplicable statement of law among a large number of correct and applicable jury

6   instructions"); *Orellana v. Castro*, No. C 00-2466 SI (PR), 2001 WL 590006 at \*5 (N.D. Cal.

7   May 23, 2001) (distinguishing *Suniga* on the basis that the predicate crime for felony murder

8   was not identified for the jury).

9          Accordingly, for the reasons set forth above, petitioner is not entitled to habeas relief on

10   this jury instruction claim.

11          **2.  Refusal to Give Proposed Jury Instruction Regarding Aiders and Abettors**

12          Petitioner's next claim is that the trial court violated his due process right to jury

13   instructions that set forth his defense theory and the relevant law, and that require the jury to

14   decide all factual issues posed by the evidence, when it declined to give a requested aider and

15   abettor instruction.  The jury instruction in question was requested by a co-defendant and

16   instructed to the effect that "an aider and abettor would be liable under the natural-and-probable-

17   consequences doctrine for a crime less serious than that committed by a perpetrator, if the lesser

18   crime was reasonably foreseeable under the natural and probable consequences doctrine but the

19   greater crime was not.  Dckt. No. 1 at 58-59.  The California Court of Appeal denied this claim,

20   reasoning as follows:

21          **III. Refusal to Give Proposed Defense Instruction**

22          During a discussion of jury instructions, Lam's attorney requested
       that the trial court supplement CALJIC No. 3.00 with the language

23       italicized below: "Each principal, regardless of the extent or
       manner of participation, is equally guilty, *except that an aider and*

24       *abettor may be found guilty of a lesser offense than the*
       *perpetrator*."  (Italics added.)  The trial court refused to give the

25       augmentation, ruling that it did not belong in the standard
       instruction.

26

19

Carroll, Cooc and Dich now claim the court committed prejudicial error in failing to accede to Lam's proposal, even though none of them joined in it at trial. They urge that the added language was a correct statement of law according to *People v. Woods* (1992) 8 Cal.App.4th 1570, 1589-1590, 11 Cal.Rptr.2d 231 (*Woods*), and necessary to a full understanding of principal and accomplice liability.

*Woods* does not support defendants' assertion that the trial court was obligated to give the augmentation. In *Woods*, the jury sent a note to the court asking if an accomplice could be found guilty of murder in the second degree if the actual perpetrator were determined to be guilty of first degree murder. (*Woods, supra*, 8 Cal.App.4th at p. 1579, 11 Cal.Rptr.2d 231.) The trial court incorrectly answered the question, "No," and the appellate court reversed. (*Id.* at pp. 1579, 1590.) *Woods* never held or suggested that the jury should, as a routine matter, be advised of the viability of a lesser verdict as to an accomplice.

Here, the trial court specifically instructed the jurors that they must decide each defendant's guilt separately. The jurors were also told that if they were not satisfied beyond a reasonable doubt that any defendant was guilty of the crime charged, they could find him or her guilty of any lesser crime shown by the evidence. In closing argument, the prosecutor reminded the jurors: "We have five defendants. You have to look at each individually and make a determination about each one individually."

Generally, "'a trial court may refuse a proffered instruction if it . . . is duplicative.'" (*People v. Brown* (2003) 31 Cal.4th 518, 559, 3 Cal.Rptr.3d 145, 73 P.3d 1137.) A trial court does not err by refusing to give specially requested instructions that are redundant (*People v. Cash* (2002) 28 Cal.4th 703, 736, 122 Cal.Rptr.2d 545, 50 P.3d 332; *People v. Turner* (1994) 8 Cal.4th 137, 203, 32 Cal.Rptr.2d 762, 878 P.2d 521) or adequately covered by other instructions (*People v. Noguera* (1992) 4 Cal.4th 599, 648, 15 Cal.Rptr.2d 400, 842 P.2d 1160). Since the concept embodied in defendants' proposed modification of CALJIC No. 3.00 was conveyed by other instructions and each defendant had the opportunity to argue the principle to the jury, the court's refusal to give the proposed addition to CALJIC No. 3.00 was not error, or was certainly harmless. (*See People v. Hughes* (2002) 27 Cal.4th 287, 361-363, 116 Cal.Rptr.2d 401, 39 P.3d 432.)

Dckt. No. 1-1 at 19-21.

Petitioner also argues that the trial court exacerbated its error in refusing to give his requested instruction when it responded to a jury question in a way that could have been reasonably understood as precluding a finding that petitioner was guilty of a lesser offense than

the individual who perpetrated the homicide.  Dckt. No. 1 at 59-60.  The background to this

argument is the following.  During deliberations, the jury asked the following question: (1) "We

want to know, can you have second degree murder with lying in wait?"  Reporter's Transcript on

Appeal (RT) at 3496.  The trial court responded, "Please clarify your question.  Is your question

as to the degree of murder or the special circumstance allegation within the meaning of Penal

Code Section 190.2(a)(15)?"  *Id.*  The jury responded to the court's question by asking: "Is it

possible for the jury to find the defendant guilty of second degree murder and lying in wait?  Or

is the finding of lying in wait significant in determining that the murder is first degree?"  *Id.* at

3497.  The court responded to this question as follows: "All murder which is perpetrated by

means of lying in wait is murder of the first degree.  You may find it helpful to refer to

Instruction 8.25.[11]  If this answer does not sufficiently answer your question, or if you have

additional questions, please set them forth in writing."  Clerk's Transcript on Appeal (CT) at

1685.  Petitioner argues that the trial court's "incomplete, misleading response, coupled with its

earlier incomplete instructions, deprived petitioner of the jury's considered decision as to the

correct degree of his liability."  Dckt. No. 1 at 59.

   Petitioner also raised this claim on direct appeal.  He argued that "the court should

instead have told the jury, pursuant to *Woods, supra,* 8 Cal.App.4th at page 1579, that an aider

and abettor may be guilty of second degree murder, even if the perpetrator committed murder by

lying in wait.  Dckt. 1-1 at 38-39.  The California Court of Appeal rejected this argument,

reasoning as follows:

> In rejecting this same claim on a motion for new trial, the trial
> court stated: "The Court's response to the jury's two questions
> about lying in wait and second degree murder . . . was a correct
> statement of the law.  The jury did not ask the question that the
> jurors did in *People v. Woods* (1992) 8 Cal. App.4th 1570, where
> the question was whether aiders and abettors could be guilty of a
> lesser degree of murder than the perpetrator.  Here there was no

---

[11]  Jury Instruction No. 8.25 stated, in pertinent part, that "Murder which is immediately
preceded by lying in wait is murder of the first degree."  CT at 1587.

mention of aiders and abettors.  Instead the question was addressed to the degree of murder associated with lying in wait.  The Court correctly stated all murder committed by means of lying in wait is first degree murder.  It referred the jurors to an instruction previously given and invited additional questions.  There were none. [¶ ] The court cannot conjecture that the jurors were actually asking a different question from the one they actually posed."

The court's ruling and observations were unassailable.  The question posed by the jury said nothing about aiding and abetting.  The jury wanted to know if a defendant could be found guilty of both second degree murder *and* lying in wait.  The trial court properly answered that *all murder* committed by lying in wait is that of the first degree and referred it to the applicable jury instruction.  The jury, apparently satisfied, asked for no further elaboration.

* * *

The trial court's decision to accurately answer only the question that was asked by the jury was reasonable and proper.  No abuse of discretion occurred.

*Id.* at 39-40.

In his claim before this court, petitioner argues that the trial court "read the jury's request too narrowly."  Dckt. No. 1 at 62.  He explains, "the question could fairly be read as asking whether a finding that the Seivert homicide was perpetrated by means of lying in wait could ever be compatible with a guilty verdict of a lesser crime than first-degree murder."  *Id.*  He argues that the jury's question "implicated the *Woods* doctrine" and that the question "could only be fully and correctly answered by an answer informed by that doctrine."  *Id.*  He further argues that the trial court's failure to respond to the question pursuant to the *Woods* doctrine violated his right to a jury instruction on his defense theory that he was "less culpable than the shooter."  *Id.* at 63.

Petitioner asserts that the correct answer to the jury's instruction was that it was indeed possible to find second degree murder with lying in wait because, under *Woods*, the jury could have found petitioner guilty of second-degree murder even if they found that Ly was guilty of first-degree murder by lying in wait.  *Id.* at 61.  The court's answer could have misled the jury

1   into thinking they could not convict petitioner of anything other than first-degree murder.  *Id.*  In

2   other words, according to petitioner, the trial court's failure to give a *Woods* instruction made its

3   response to the jury's question incomplete and potentially misleading.  *Id.*  Petitioner argues that

4   if the trial court had given his requested instruction and answered the jury question correctly, the

5   jury might well have convicted him of a lesser crime than first degree murder, especially given

6   the lack of evidence that petitioner knew of any plan or intent to shoot Seivert.  *Id.* at 65.

7         The issue before this court is not whether the trial court's failure to give petitioner's

8   requested jury instruction violated California law, but whether the court's failure to give the jury

9   instruction violated petitioner's federal constitutional rights.  "[F]ederal habeas corpus relief

10  does not lie for errors of state law."  *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990).  In the context of

11  this habeas petition, this court must determine whether the state court's decision rejecting this

12  claim was contrary to or an unreasonable application of United States Supreme Court authority.

13        In general, a challenge to jury instructions does not state a federal constitutional claim.

14  *Engle v. Isaac*, 456 U.S. 107, 119 (1982)); *Gutierrez v. Griggs*, 695 F.2d 1195, 1197 (9th Cir.

15  1983).  In order to warrant federal habeas relief, a challenged jury instruction "cannot be merely

16  'undesirable, erroneous, or even "universally condemned,"' but must violate some due process

17  right guaranteed by the fourteenth amendment."  *Cupp*, 414 U.S. at 146.  To prevail on such a

18  claim petitioner must demonstrate "that an erroneous instruction 'so infected the entire trial that

19  the resulting conviction violates due process.'"  *Prantil v. State of Cal.*, 843 F.2d 314, 317 (9th

20  Cir. 1988) (quoting *Darnell v. Swinney*, 823 F.2d 299, 301 (9th Cir. 1987)).  In making its

21  determination, this court must evaluate the challenged jury instructions "'in the context of the

22  overall charge to the jury as a component of the entire trial process.'"  *Id.* (quoting *Bashor v.

23  Risley*, 730 F.2d 1228, 1239 (9th Cir. 1984)).  Where, as here, the challenge is to a refusal or

24  failure to give an instruction, the petitioner's burden is "especially heavy," because "[a]n

25  omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the

26  law."  *Henderson*, 431 U.S. at 155.  *See also Villafuerte v. Stewart*, 111 F.3d 616, 624 (9th Cir.

1  1997).

2         The California Court of Appeal concluded that the trial court's failure to give petitioner's

3  requested jury instruction that he could be found guilty of a lesser offense than Ly was harmless

4  because other jury instructions essentially told the jury the same thing.  This conclusion is not

5  unreasonable.  Although petitioner's jury was not specifically told that "an aider and abettor may

6  be found guilty of a lesser offense than the perpetrator," the jury was informed that "they must

7  decide separately whether each of the defendants is guilty or not guilty," and that they could find

8  a defendant "guilty of any lesser crime provided you are satisfied beyond a reasonable doubt that

9  he or she is guilty of the lesser crime."  CT at 1604, 1620.  Although these instructions do not

10  contain the identical language suggested by petitioner, they essentially gave the same message to

11  the jury: that the culpability of each defendant must be decided separately, and that each

12  defendant could be found guilty of a "lesser crime" if the evidence showed they were guilty of

13  that lesser crime.  The prosecutor reinforced this theme when she told the jury that "We have

14  five defendants.  You have to look at each individually and make a determination about each one

15  individually."  RT at 3458.  The jury was also informed that "an act that is a fresh and

16  independent product of the mind of one of the participants is not a natural and probable

17  consequence."  *Id.* at 3151.  Under these circumstances, the trial court's failure to give

18  petitioner's requested instruction did not have a substantial and injurious effect or influence in

19  determining the jury's verdict.

20         The trial court's response to the jury's question, described above, does not change this

21  result.  There is no evidence in the record that the jury was confused about whether it could find

22  aiders and abettors guilty of a lesser crime than the perpetrator.  The state trial and appellate

23  courts found that the jury's question was "addressed to the degree of murder associated with

24  lying in wait," and that the trial court's actions in referring the jury to CALJIC No. 8.25 cleared

25  up the jurors' confusion on that score.  This finding is not unreasonable.

26  ////

24

1    "When a jury makes explicit its difficulties a trial judge should clear them away with

2    concrete accuracy."  *Bollenbach v. United States*, 326 U.S. 607, 612-13 (1946); *see also Weeks*

3    *v. Angelone*, 528 U.S. 225, 234 (2000).  However, where, as here, the trial judge "respond[s] to

4    the jury's question by directing its attention to the precise paragraph of the constitutionally

5    adequate instruction that answers its inquiry," and the jury asks no followup question, a

6    reviewing court can presume "that the jury fully understood the judge's answer and

7    appropriately applied the jury instructions."  *Waddington v. Sarausad*, 555 U.S. 179, 196 (2009)

8    (quoting *Weeks*, 528 U.S. at  234) ("A jury is presumed to understand a judge's answer to a

9    question).  Under these established standards, it was not objectively unreasonable for the state

10   court to conclude that petitioner's jury received the answers it needed to resolve its confusion

11   over the degree of murder associated with lying in wait.  The fact that the jurors asked no further

12   questions and were able to reach a unanimous verdict indicates that they were satisfied with the

13   court's answer and that it cleared up their confusion.

14   For the foregoing reasons, petitioner is not entitled to relief on this claim.

15   **3.  Improper Exclusion of Evidence**

16   In his third ground for relief, petitioner claims that the trial court violated his

17   constitutional rights to due process, to present a complete defense, and to trial by jury when it

18   excluded Ly's statements to police that he shot Seivert because he believed Seivert was about to

19   run him over with his car.  Dckt. No. 1 at 66.  The California Court of Appeal denied this claim,

20   reasoning as follows:

21   **II. Exclusion of Ly's Statements to the Police**

22   Pursuant to Evidence Code sections 1250 and 1252, Carroll, Cooc,
     Dich and Lam moved to introduce Ly's statements to police, in
23   which Ly claimed that he shot Seivert because he feared that the
     victim was about to run him over.  The statements were made on
24   January 10, almost three weeks after the killing of Seivert.  After
     initially denying any connection with the murder, Ly admitted that
25   he fired three shots at the Camry, adding that he did so because he
     thought Seivert was going to run him over.

26

The trial court refused to admit the evidence, finding that, under the totality of the circumstances, the statements were not trustworthy because they were made (1) in a coercive atmosphere of police interrogation; (2) while Ly knew he was under suspicion for murder; and (3) at a time when Ly "had every reason to come up with an explanation for his actions."  Defendants claim the evidentiary ruling constituted an abuse of discretion.

Evidence Code section 1250, subdivision (a) provides: "*Subject to [Evidence Code] Section 1252*, evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation . . . is not made inadmissible by the hearsay rule when: [¶] (1) The evidence is offered to prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action; or [¶] (2) The evidence is offered to prove or explain acts or conduct of the declarant." (Italics added.)  Section 1252 provides: "Evidence of a statement is inadmissible . . . if the statement was made under circumstances such as to indicate its lack of trustworthiness."

"'The decision whether trustworthiness is present requires the court to apply to the peculiar facts of the individual case a broad and deep acquaintance with the ways human beings actually conduct themselves in the circumstances material under the exception.  Such an endeavor allows, in fact demands, the exercise of discretion.'  [Citation.]  A reviewing court may overturn the trial court's finding regarding trustworthiness only if there is an abuse of discretion." (*People v. Edwards* (1991) 54 Cal.3d 787, 819-820, 1 Cal.Rptr.2d 696, 819 P.2d 436 (*Edwards*).)

"To be admissible under Evidence Code section 1252, statements must be made in a natural manner, and not under circumstances of suspicion, so that they carry the probability of trustworthiness.  Such declarations are admissible only when they are '"made at a time when there was no motive to deceive."'" (*Edwards, supra*, 54 Cal.3d at p. 820, 1 Cal.Rptr.2d 696, 819 P.2d 436.)

We can conceive of few examples of an untrustworthy statement more worthy of exclusion under Evidence Code section 1252 than one made by a defendant who, during a police interrogation, after having initially denied any involvement in the crime, makes a statement admitting guilt but seeking to minimize or eliminate his culpability.  As in *Edwards*, where the defense sought to introduce a taped statement by the defendant shortly after his arrest, Ly "had a compelling motive to deceive and seek to exonerate himself from, or at least to minimize his responsibility for, the shooting[ ]." (*Edwards, supra*, 54 Cal.3d at p. 820, 1 Cal.Rptr.2d 696, 819 P.2d 436.)  The trial court did not abuse its discretion.

////

1

2

3

4

5

6

7

8

9

> Even if the trial court erroneously excluded Ly's statements, we see no prejudice from the ruling.   The jury heard testimony from several different sources that Ly told his companions after the shooting he "did what [he] had to do" and that he shot Seivert because he feared Seivert was going to run him over with the Camry.   Indeed, defense counsel used these statements as a cornerstone of their argument against a murder verdict.   Ly's unsurprising repetition of the same exculpatory statements almost three weeks after the shooting was cumulative of other testimony and would not have significantly altered the jury's evaluation of the events that night.   Under any standard, the error was harmless. (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711]; *see also People v. Fudge* (1994) 7 Cal.4th 1075, 1102-1103, 31 Cal.Rptr.2d 321, 875 P.2d 36 [applying harmless error test of *People v. Watson* (1956) 46 Cal.2d 818, 836, 299 P.2d 243 (*Watson*) to erroneous exclusion of evidence].)

10  Dckt. No. 1-1 at 16-19.

11       Petitioner argues that Ly's statements were trustworthy and were "most likely true."

12  Dckt. No. 1 at 66.  Citing *Chia v. Cambra*, 360 F.3d 997, 1004 (9th Cir. 2004) and *Miller v.*

13  *Stagner*, 757 F.2d 988 (9th Cir. 1985), petitioner argues that this court must apply a five-part

14  balancing test to determine whether the trial court's exclusion of Ly's statements violated his

15  right to due process.  *Id.* at 68-72.  According to petitioner, after applying those five factors it is

16  clear that the trial court's exclusion of Ly's statements to police violated his federal

17  constitutional rights.  *Id.*  With respect to whether the trial court's ruling resulted in prejudice,

18  petitioner argues that "there can be no doubt that, had the jury in this case been permitted to view

19  the excluded Ly statements, it could well have concluded that Ly had acted in imperfect self-

20  defense, thereby reducing petitioner's exposure to, at worst, the crime of voluntary

21  manslaughter."  *Id.* at 74.  Petitioner argues that Ly's statements, if credited, "establish[] a

22  paradigmatic imperfect self-defense scenario."  *Id.*

23       The United States Supreme Court has acknowledged a "traditional reluctance to impose

24  constitutional restraints on ordinary evidentiary rulings by state trial courts."  *Crane v. Kentucky*,

25  476 U.S. 683, 689 (1986).  Accordingly, a state court's evidentiary ruling, even if erroneous, is

26  grounds for federal habeas relief only if it renders the state proceedings so fundamentally unfair

1    as to violate due process. *Estelle*, 502 U.S. at 68-70.  The United States Supreme Court has not

2    "squarely addressed" whether a state court's exercise of discretion to exclude testimony violates

3    a criminal defendant's right to present relevant evidence. *Moses v. Payne*, 555 F.3d 742, 758-59

4    (9th Cir. 2009).  Accordingly, the decision of the California Court of Appeal that the trial court's

5    discretionary evidentiary ruling did not violate the federal constitution is not contrary to or an

6    unreasonable application of clearly established United States Supreme Court precedent and may

7    not be set aside. *Id.  See Wright v. Van Patten,* 552 U.S. 120, 126 (2008) (per curiam) (relief is

8    "unauthorized" under Section 2254(d)(1) when the Supreme Court's decisions "given no clear

9    answer to the question presented, let alone one in [the petitioner's] favor," because the state

10   court cannot be said to have unreasonably applied clearly established Federal law). *See also*

11   *Anguiano v. Morales*, No. C 98-4751 SI(PR), 2000 WL 630870 at *9 (N.D. Cal. May 2, 2000)

12   (trial court's exercise of discretion under Cal. Evid. Code § 1252 to exclude untrustworthy

13   evidence did not violate defendant's right to present a defense).[12]

14         Even assuming arguendo that the trial court's exclusion of Ly's statements to police was

15   constitutional error, the error could not have had a "substantial and injurious effect or influence

16   in determining the jury's verdict" under the circumstances of this case. *Brecht* , 507 U.S. at 623.

17   Several trial witnesses testified that Ly told them he shot Seivert because he thought Seivert was

18   going to run over him with his car.  One witness testified that Ly shot Seivert "as defense." *See*

19   RT at 1907-08, 1989, 2151, 2285-86, 2309, 2311.  Ly's statements to police were essentially

20

21         [12]   In the past, the Ninth Circuit applied a "balancing test" to assess the constitutionality
     of a trial court's discretionary decision to exclude evidence. *See Miller v. Stagner*, 757 F.2d 988,
22   994–95 (9th Cir. (1985).  That test was also employed in *Chia v. Cambra*, 360 F.3d 997, 1003-04
     (9th Cir. 2004), the case relied on by petitioner in support of this claim.  However, in *Moses*, the
23   Ninth Circuit concluded that the *Miller* balancing test "is a creation of circuit law," rather than
     clearly established Supreme Court precedent, for purposes of Section 2254(d)(1). 555 F.3d at
24   759–60.  Therefore, the *Miller* test should not be used in federal habeas review of a challenge to
     a state court's exercise of discretion to exclude testimony pursuant to a state evidentiary rule
25   affording such discretion. *Id.*  "The AEDPA does not permit [a habeas court] to rely on [the
     *Miller*] balancing test to conclude that a state trial court's exclusion of evidence . . . violated
26   clearly established Supreme Court precedent." *Id.* at 760.

1  cumulative of this trial testimony.  *See* CT at 2861, 2874-78, 2880-81, 2906.  Several of the

2  defense counsel emphasized this trial testimony in their closing, arguing that Ly shot Seivert

3  because he was afraid he was going to get run over by Seivert's car.  *See, e.g.*, RT at 3247-49

4  (Ly's counsel), 3310, 3312 (Lam's counsel).  Accordingly, Ly's state of mind at the time of the

5  shooting; i.e., that he shot Seivert only after Seivert attempted to run him over, was squarely

6  before the jury.  The absence of cumulative testimony to the same effect would not have effected

7  the outcome of this trial.

8      The decision of the California Court of Appeal was not contrary to or an unreasonable

9  application of clearly established Federal law on the constitutional rights to present a defense, to

10  due process, or to trial by jury.  Accordingly, petitioner is not entitled to relief on this claim.

11  **4.  Coerced Verdict**

12      Petitioner's final claim is that the trial court's interactions with the jury during

13  deliberations resulted in a coerced verdict, in violation of his Sixth Amendment right to an

14  impartial jury and his Fourteenth Amendment right to due process.  Dckt. No. 1 at 75-89.  The

15  California Court of Appeal explained the background to this claim, and its decision thereon, as

16  follows:

17      The jurors reported that they were deadlocked on the fate of Cooc,
       after having reached verdicts as to the other defendants.  In
18      response to the court's inquiry, the jury advised that it had taken
       nine votes on the verdict and that the split on the last ballot was
19      nine to three.  The jury also answered negatively when asked if
       further instructions or testimony readback would be of assistance.
20
21      Subsequently, the court received word from the court attendant
       that Juror No. 10 told him that the foreperson had talked about the
22      case in the elevator and that he [Juror No. 10] wanted the judge to
       know the foreperson was "the stickler."  The court then
23      interviewed each juror separately about the alleged elevator
       statement.  Each of the jurors except Juror No. 10 denied hearing
24      any discussion about the case in the elevator.  Juror No. 10
       maintained that Juror No. 7 said, while in the elevator and in the
25      presence of other jurors, that he was not going to change his vote.
       Juror No. 7 adamantly denied making the statement in the elevator,
26      claiming he had said it in the jury room.

At that point, Cooc's counsel conceded that there had been no provable jury misconduct, but asked for a mistrial, apparently on the ground of a hopelessly deadlocked jury.  Without ruling on the motion and at the suggestion of the prosecutor, the court decided to give the jury an instruction to deadlocked juries that was approved by this court in *People v. Moore* (2002) 96 Cal.App.4th 1105, 1118-1122, 117 Cal.Rptr.2d 715 (*Moore*).)  The *Moore* instruction tells the jurors that their goal "should be to reach a fair and impartial verdict if you are able to do so based solely on the evidence presented and without regard for the consequences of your verdict regardless of how long it takes to do so"; that it was their duty to "discuss your views regarding the evidence, and to listen to and consider the views of your fellow jurors"; that "[i]n the course of your further deliberations, you should not hesitate to re-examine your own views or to request your fellow jurors to re-examine theirs"; that "[f]air and effective jury deliberations require a frank and forthright exchange of views"; that "each of you must decide the case for yourself, and you should do so only after a full and complete consideration of all of the evidence with your fellow jurors"; and that "[i]t is your duty as jurors to deliberate with the goal of arriving at a verdict on the charge if you can do so without violence to your individual judgment."  The instruction also encourages the jurors to consider trying new methods in conducting their deliberations, such as reversing roles and advocating for a position not held by the individual juror.  (*Id.* at pp. 1118-1119, 117 Cal.Rptr.2d 715.)  Without objection, the court read the *Moore* instruction to the jury, and suggested the jury reread CALJIC Nos. 1.00, 17.40 and 17.41, which offer guidance in conducting jury deliberations.

Cooc claims the "totality of the circumstances," including the court's refusal to poll the jury regarding prospects for a verdict, the court's "intrusive questioning" of individual jurors regarding the alleged statement in the elevator and the giving of the *Moore* instruction, amounted to jury coercion by the trial court.  The argument borders on the frivolous.

Cooc's trial attorney acquiesced to the entire course of judicial conduct which Cooc now claims constituted coercion.  By doing so, he has forfeited the claim on appeal.  (*See People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1038, 47 Cal.Rptr.3d 467, 140 P.3d 775.)[13]

---

[13]  Although Cooc's counsel moved for a mistrial after the court finished interviewing the jurors, he did not base the motion on jury coercion.  In any event, his failure to press for a ruling on the motion prevents him from raising any complaint in connection therewith on appeal. (*People v. Braxton* (2004) 34 Cal.4th 798, 813, 22 Cal.Rptr.3d 46, 101 P.3d 994; *People v. Obie* (1974) 41 Cal.App.3d 744, 750, 116 Cal.Rptr. 283, *disapproved on different grounds* in *People v. Rollo* (1977) 20 Cal.3d 109, 120, fn. 4, 141 Cal.Rptr. 177, 569 P.2d 771.

> In any event, we see no impropriety.  A neutral inquiry into the jury's numerical division on a verdict has long been held a proper exercise of the court's inherent authority over jury deliberations. (*People v. Rodriguez* (1986) 42 Cal.3d 730, 776, fn. 14, 230 Cal.Rptr. 667, 726 P.2d 113; *People v. Carter* (1968) 68 Cal.2d 810, 815, 69 Cal.Rptr. 297, 442 P.2d 353.)  The court's questioning of the jurors following the alleged "elevator" comment was also beyond reproach.  The record provides no support for Cooc's assertion that the judge sent a "clear message" that she did not believe the holdout juror's denial of misconduct.  Finally, we reject Cooc's argument that the *Moore* instruction is inherently coercive.  As we stated in *Moore*, "[n]othing in the trial court's charge was designed to coerce the jury into returning a verdict. [Citation.] Instead, the charge simply reminded the jurors of their duty to attempt to reach an accommodation." (*Moore, supra*, 96 Cal.App.4th at p. 1121, 117 Cal.Rptr.2d 715.)[14]  Both individually and collectively, Cooc's accusations of jury coercion fail miserably.

Dckt. No. 1-1 at 43-46.

Petitioner argues that the entire course of conduct engaged in by the trial judge constituted a "flawed *Allen* charge" which coerced the jurors who did not agree with the majority, and especially juror No. 7, to reach a unanimous verdict.  Dckt. No. 1 at 84.  He claims that the supplemental jury instruction given by the trial court was coercive because it did not remind the jurors they should not relinquish their own conscientiously held beliefs.  *Id.* at 86.  Citing *Brasfield v. United States*, 272 U.S. 448 (1926), petitioner also argues that the trial court's polling of the jurors was improper and resulted in coercion.  *Id.* at 87.  He further contends that the trial court's questioning of the jurors, and especially Juror No. 7, contributed to the coercive atmosphere.  *Id.* at 87-88.  Petitioner sums up the allegedly coercive circumstances as follows:

> the jury's deliberations over portions of five days before a problem arose; the court's determination of the jury's collective belief that neither instructions nor rereading of testimony would assist; the trial court's intrusive investigation of the allegedly recalcitrant juror; the trial court's patent skepticism toward the recalcitrant juror's denials of wrongdoing; the trial court's refusal to poll the jurors; the trial court's "dynamite" instruction to the jury; and the

---

[14]  Use of the *Moore* instruction has also been approved by the Court of Appeal for the Sixth Appellate District in *People v. Whaley* (2007) 152 Cal.App.4th 968, 984, 62 Cal.Rptr.3d 11.

1      omission of a directive to the jurors not to yield a conscientious
        conviction.
2

3   *Id.* at 76.  Petitioner argues that "the unique set of events after the verdicts as to the other

4   defendants, viewed in light of the 'context' and 'all the circumstances,' coerced a verdict against

5   petitioner."  *Id.* at 88.  Petitioner does not challenge the trial court's actions individually; rather,

6   he claims that those actions, when considered as a whole, resulted in unfair coercion of the jury.

7   *Id.* at 75-76.  In essence, he appears to be contending that the trial court's actions constituted a

8   de-facto *Allen* charge which pushed the jury, and more specifically Juror No. 7, to reach a

9   verdict.[15]

10          An "*Allen* charge" is

11             the generic name for a class of supplemental jury instructions
                given when jurors are apparently deadlocked; the name derives
12             from the first Supreme Court approval of such an instruction in
                *Allen v. United States*, 164 U.S. 492, 501-02, 17 S.Ct. 154, 41
13             L.Ed. 528 (1896).  In their mildest form, these instructions carry
                reminders of the importance of securing a verdict and ask jurors to
14             reconsider potentially unreasonable positions.  In their stronger
                forms, these charges have been referred to as "dynamite charges,"
15             because of their ability to "blast" a verdict out of a deadlocked
                jury.  The charge has also been called the "third degree
16             instruction," "the shotgun instruction," and "the nitroglycerin
                charge."
17

18  *United States v. Berger*, 473 F.3d 1080, 1089 (9th Cir. 2007) (quoting *United States v. Mason*,

19  658 F.2d 1263, 1265 n.1 (9th Cir. 1981)).  The *Allen* charge, "while productive of continued

20  comment and debate, is nevertheless an instruction that has been accepted for many years."

21  *Mason*, 658 F.2d at 1265.  The *Allen* instruction is most often used in cases of "apparent juror

22  deadlock" to "admonish jurors to keep trying."  *Id.*  "In the archetypal *Allen* charge context, the

23  _____

24      [15]  Respondent argues that the California Court of Appeals' conclusion that petitioner
    forfeited this claim on appeal constitutes a procedural default which prevents this court from
    considering the merits of this claim.  Dckt. No. 15 at 64.  The court finds that petitioner's jury
25  coercion claim can be resolved more easily by addressing it on the merits and will therefore
    assume that the claim is not subject to a procedural default.  *Lambrix*, 520 U.S. at 524-25;
26  *Franklin*, 290 F.3d at 1232.

1  judge instructs a deadlocked jury to strive for a unanimous verdict." *Weaver v. Thompson*, 197

2  F.3d 359, 365 (9th Cir. 1999).

3        A trial judge's instruction to a jury to continue deliberations is impermissible only if the

4  jury was improperly coerced to relinquish their views in favor of reaching a unanimous decision,

5  thus infringing the defendant's right to due process. *Lowenfield v. Phelps*, 484 U.S. 231, 237-41

6  (1988) (combination of polling of the jury on whether further deliberations might lead to a

7  verdict and supplemental instruction was not "coercive" in such a way as to deny petitioner any

8  constitutional right). In the Ninth Circuit, the use of an *Allen* charge is permissible unless the

9  charge impermissibly coerced the jury. *See*, *e.g. United States v. Hernandez*, 105 F.3d 1330,

10  1333 (9th Cir. 1997) (an *Allen* charge "must be upheld unless it is clear from the record that the

11  charge had an impermissibly coercive effect on the jury"). Whether the comments and conduct

12  of a state trial judge infringe a defendant's due process right to an impartial jury and fair trial

13  turns upon whether "the trial judge's inquiry would be likely to coerce certain jurors into

14  relinquishing their views in favor of reaching a unanimous decision." *Locks v. Sumner*, 703 F.2d

15  403, 406 (9th Cir. 1983). A reviewing court considers whether the court's actions and

16  statements were coercive in the totality of the circumstances. *Lowenfield*, 484 U.S. at 237.[16]

17  ////

18  ////

19

20       [16] In *Jiminez v. Myers*, 40 F.3d 976, 979 -980 (9th Cir. 1993), a case cited by petitioner in support of this claim, the Ninth Circuit determined that the state trial court's comments and conduct following a jury impasse constituted a "de facto" *Allen* charge and violated the

21  petitioner's right to a fair trial and an impartial jury. The United States Supreme Court, however, has never held that a "de facto" *Allen* charge is unconstitutional, nor, indeed, that such

22  a doctrine even exists. The Supreme Court has made clear that law created by a federal appellate court is not "clearly established Federal law" within the meaning of AEDPA. *Williams*, 529

23  U.S. at 412. Under these circumstances, it is not clear that a state court's failure to address the concept of a "de facto" Allen charge, as exemplified in *Jiminez*, would constitute an objectively

24  unreasonable failure to apply clearly established United State Supreme Court holdings, as required by AEDPA. However, assuming arguendo that the concept of a "de facto" *Allen* charge

25  is "clearly established" United States Supreme Court authority, this court will address petitioner's claim that the trial court violated his federal constitutional rights by giving a

26  "flawed" *Allen* charge.

1    "So long as the defendant has offered facts that fairly support an inference that jurors

2    who did not agree with the majority felt pressure from the court to give up their conscientiously

3    held beliefs in order to secure a verdict," a reviewing court must "proceed to the *Allen* charge

4    analysis." *Weaver*, 197 F.3d at 365. This court will assume that the trial court's supplemental

5    jury instruction in this case constituted an "*Allen* charge." The Ninth Circuit Court of Appeals

6    has identified several factors to assist a reviewing court in determining whether a supplemental

7    jury instruction of this kind violates due process: "(1) the form of the instruction, (2) the time the

8    jury deliberated after receiving the charge in relation to the total time of deliberation, and (3) any

9    other indicia of coerciveness." *Berger*, 473 F.3d at 1090 (quoting *United States v. Steele*, 298

10   F.3d 906, 911 (9th Cir. 2002)). *See also Weaver*, 197 F.3d at 366.

11   Considering the first factor, the trial judge's supplemental instruction in this case: (1)

12   informed the jurors that they had "the absolute discretion to conduct your deliberations in any

13   way you deem appropriate;" (2) informed the jurors that their "goal as jurors should be to reach a

14   fair and impartial verdict if you are able to do so based solely on the evidence presented" and

15   "without doing violence to your individual judgment;" (3) phrased the judge's comments as

16   suggestions; and (4) emphasized that the trial judge was not "dictating or instructing you as to

17   how to conduct your deliberations." RT at 3594-96. While the instruction informed the jurors

18   that they should not hesitate to change their views, it advised them to do so only if they were

19   "convinced" their prior vote was "wrong." The instruction did not advise the jurors to acquiesce

20   in the majority decision, but stressed that each juror should carefully weigh the evidence and

21   "decide the case for yourself." *Id.* Before questioning the jurors about the allegations made by

22   Juror No. 10, the trial court in this case specifically told the jurors that:

23            A matter has come up which requires my investigation. And I'm
              going to be asking all the jurors questions. And in asking
24            questions I do not seek to influence your deliberations or to
              suggest what your verdict should be, or to determine your thoughts
25            or opinions or to intrude into the deliberative process in any way.
              Please disregard anything I say that may suggest the contrary to
26            you.

34

1   *Id.* at 3574-76.  The form of the supplemental instruction, and these comments in particular,

2   minimized any coercive effect the supplemental instruction may have otherwise had.  *Cf. Mason*,

3   658 F.2d at 1271 (finding an *Allen* charge improper where jury was informed that "[i]f, on the

4   other hand, the majority was for acquittal, the minority ought to ask themselves whether they

5   might not reasonably doubt the correctness of the judgment which was not concurred in by the

6   majority").

7          Turning to the second factor, the length of time the jurors in petitioner's case deliberated

8   after receiving the trial court's supplemental instruction suggests that the instruction did not

9   influence or coerce the verdict.  After receiving the *Moore* instruction, the jury resumed

10  deliberations at 2:40 p.m. on September 7, 2005 and reached a verdict on the morning of

11  September 9, 2005.  CT at 184, 192.  In cases involving far shorter time periods between the

12  supplemental instruction and the verdict, the Ninth Circuit has found no coercive effect resulting

13  from an *Allen* charge.  *See e.g., United States v. Bonam*, 772 F.2d 1449, 1450-51 (9th Cir. 1985)

14  (finding no coercion where there was one day in total of deliberation, one-and-a-half hours of

15  which came after *Allen* charge); *United States v. Lorenzo*, 43 F.3d 1303, 1307 & n.3 (9th Cir.

16  1995) (no coercion with five-and-a-half hours of deliberation coming after *Allen* charge).  *Cf.*

17  *Weaver*, 197 F.3d at 366 (coercion found to exist when jury returned with unanimous verdict

18  five minutes after receiving *Allen* charge).

19         Turning to the third factor, this court concludes that there is no other significant indicia

20  of coercion in this case.  The trial court's supplemental instruction was not directed toward a

21  specific juror or set of jurors, but was addressed to the entire jury.  The judge "did not even

22  know whether the majority position was to convict or acquit."  *Berger*, 473 F.3d at 1093

23  (quoting *Lorenzo*, 43 F.3d at 1307).  There was no indication that any particular juror, or just one

24  juror, was a holdout for acquittal – on the contrary, the jury's answer to the court's poll indicated

25  only that the latest vote had been nine to three.  The trial court's questioning of all of the jurors

26  regarding the alleged incident in the elevator did not reveal much of anything about any

1    particular juror.  Although the trial judge asked Juror No. 7 whether he "denied" saying in the

2    elevator that he was not going to change his vote, the court does not find use of the word "deny"

3    to constitute coercive "cross-examination," as alleged by petitioner.  *See* Dckt. No. 22 at 45.

4    Rather, it appears that the trial judge was simply trying to pinpoint whether the juror made the

5    contested remark in the elevator, as the judge had been told.

6           In *Jimenez*, a case relied on heavily by petitioner in support of this claim, the Ninth

7    Circuit held that, when "viewed against the backdrop of the particular circumstances of the

8    case," the trial judge's comments and conduct amounted to the giving of a coercive "de facto"

9    *Allen* charge:

10              After the first impasse, by eliciting the progression in the voting,
                determining if it was moving in one direction, expressing his
11              approval of that progression, and telling the jury to continue its
                deliberations, the trial court effectively instructed the jury to make
12              every effort to reach a unanimous verdict.  In view of the
                disclosure after the second impasse that only one juror remained in
13              the minority and the trial court's implicit approval of the
                "movement" toward unanimity, the court's instruction to continue
14              deliberating until the end of the day sent a clear message that the
                jurors in the majority were to hold their position and persuade the
15              single hold-out juror to join in a unanimous verdict, and the
                hold-out juror was to cooperate in the movement toward
16              unanimity.

17   40 F.3d at 980-81.  The court in *Jimenez* particularly noted the trial court's failure to "counter-

18   balance the implication of its questions and comments by instructing the hold-out juror not to

19   surrender his or her sincere convictions," noting that such a supplemental instruction was

20   available under California law.  *Id.* at 981 & n.5.

21          In *Rodriguez v. Marshall*, 125 F.3d 739 (9th Cir. 1997), *overruled on other grounds* by

22   *Payton v. Woodford*, 299 F.3d 815 (9th Cir. 2002), the Ninth Circuit Court of Appeals denied

23   habeas relief after rejecting a claim that a "de facto" *Allen* charge should be found based on

24   circumstances which occurred during deliberations.  The jurors had declared themselves

25   deadlocked on four occasions over 15 days and, on day 11, the trial judge inquired into the

26   numerical split of the jurors.  As a result, he learned that the vote remained at 11–1 after five

                                                36

1   ballots. 125 F3d at 742, 748.  The Ninth Circuit rejected the petitioner's contention that this

2   circumstance, coupled with the fact that the trial judge required the jury to continue deliberating

3   despite repeated deadlocks, constituted a "de facto" *Allen* charge.  The court noted that, because

4   the claim did not rest on an actual, explicit *Allen* charge, the court could not grant habeas relief

5   unless it was "'clear from the record' 'that the alleged charge had an impermissible coercive

6   effect on the jury.'"  *Id.* at 750.  The court characterized the *Jimenez* decision as involving a

7   failure by the trial judge to remind the jury of their duty not to surrender their sincerely held

8   beliefs "while at the same time making it clear that he wished them to return a unanimous

9   verdict."  *Id.*  Neither circumstance was found to exist in *Rodriguez*: the trial judge had

10  instructed the jurors to hold onto their beliefs and, after learning of the numerical split on five

11  ballots, made no comment and did not know whether the majority favored conviction or acquittal

12  or the identity of the hold-out juror.  Additionally, the jurors deliberated for four days after the

13  numerical split inquiry.  *Id.* at 751.

14          The situation in this case is more akin to the *Rodriguez* decision than to the *Jimenez*

15  decision.  Here, unlike in *Jimenez*, the trial judge did not make repeated inquiries about

16  movement toward a verdict, nor did he express approval of such movement.  Further, the trial

17  judge in this case did not exert constant pressure on the jurors to reach a verdict.  Although in

18  *Jimenez* no counter-balancing instruction was given despite the availability of such an

19  instruction under California law, petitioner's jury received CALJIC 17.40, which states, among

20  other things:

21                  The People and the defendant are entitled to the individual opinion
                of each juror.  Each of you must consider the evidence for the
22              purpose of reaching a verdict if you can do so.  Each of you must
                decide the case for yourself, but should do so only after discussing
23              the evidence and instructions with other jurors.  Do not hesitate to
                change an opinion if you are convinced it is wrong.  However, do
24              not decide any question in a particular way because a majority of
                the jurors, or any of them, favor such a decision.

25

26  CT at 1623.

1    In any event, the absence of a specific instruction to hold on to conscientiously held

2  beliefs does not, by itself, demonstrate coercion.  *See Berger*, 473 F.3d at 1091 (trial judge's

3  failure to specifically tell jurors not to let go of their conscientiously held beliefs offset by other

4  comments by the judge telling the jury to hold on to their beliefs).  Petitioner's jury was never

5  directed that it was required to reach a verdict, nor were any constraints placed on any individual

6  juror's responsibility to weigh and consider all the evidence presented at trial.  The trial court

7  also made no remarks either urging a verdict be reached or indicating possible reprisals for

8  failure to reach an agreement.  This is not a case in which "it's clear from the record that the

9  charge had an impermissibly coercive effect on the jury."  *United States v. Williams*, 547 F.3d

10  1187, 1205 (9th Cir. 2008).  The court also notes that petitioner's counsel did not object to either

11  the jury polls or the supplemental instruction pursuant to *People v. Moore*.  Although this does

12  not constitute a waiver of this issue, *Wainwright v. Witt*, 469 U.S. 412, 431, n.11 (1985), it

13  indicates that "the potential for coercion argued now was not apparent to one on the spot."

14  *Lowenfield*, 484 U.S. at 240.

15    It is true that a trial court's inquiry into the jury's numerical division has been found to be

16  coercive in some cases.  In *Brasfield*, the United States Supreme Court concluded that the trial

17  court's inquiry into how the jury was divided necessitated per se reversal because it was

18  generally coercive and brought to bear an improper influence on the jury.  272 U.S. at 450.

19  However, *Brasfield* was based on the Supreme Court's supervisory power over the federal

20  courts.  "The Federal Courts of Appeals have uniformly rejected the notion that *Brasfield*'s per

21  se reversal approach must be followed when reviewing state proceedings on habeas corpus."

22  *Lowenfield*, 484 U.S. at 240, n.3.  A trial court's inquiry into the jury's balloting violates a

23  defendant's right to an impartial jury and a fair trial only "if the trial judge's inquiry would be

24  likely to coerce certain jurors into relinquishing their views in favor of reaching a unanimous

25  decision."  *Locks*, 703 F.2d at 406.  For the reasons described above, the court concludes that,

26  under the totality of the circumstances, the jury verdict in this case was not coerced,

1  notwithstanding the trial court's inquiry into the jury's numerical division.  The trial judge's

2  failure to inquire whether further deliberations could produce a verdict does not change this

3  result.  *See United States v. Sommerstedt*, 752 F.2d 1494, 1497-98 (9th Cir.), *modified*, 760 F.2d

4  999 (9th Cir. 1985) (question of whether to declare a mistrial when a jury indicates it is

5  deadlocked is left to the sound discretion of the trial court after consideration of all the relevant

6  circumstances); *United States v. Goldstein*, 479 F.2d 1061, 1069 (9th Cir. 1973) (trial court is in

7  the best position to determine the likelihood that a jury will be able to reach a verdict).

8        The decision of the California Court of Appeal rejecting petitioner's claim of jury

9  coercion is not contrary to or an unreasonable application of the federal standards set forth above

10 and should not be set aside.  Under the circumstances, and looking at the record as a whole, this

11 court concludes that the trial judge's interaction with the jury during deliberations, including it's

12 supplemental instruction and the jury polling, did not unduly coerce the jury to render a

13 unanimous verdict or otherwise render petitioner's trial fundamentally unfair.  Accordingly,

14 relief on this claim should be denied.

15 **IV.  Conclusion**

16       For all of the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's

17 application for a writ of habeas corpus be denied.

18       These findings and recommendations are submitted to the United States District Judge

19 assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one

20 days after being served with these findings and recommendations, any party may file written

21 objections with the court and serve a copy on all parties.  Such a document should be captioned

22 "Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections

23 within the specified time may waive the right to appeal the District Court's order.  *Turner v.*

24 *Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).  In

25 his objections petitioner may address whether a certificate of appealability should issue in the

26 event he files an appeal of the judgment in this case.  *See* Rule 11, Federal Rules Governing

Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

DATED:   April 5, 2012.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE

40